# UNITED STATES DISTRICT COURT
### for the
### DISTRICT OF MAINE

| | |
|---|---|
| _____<br>**Adam Cotten, by his guardian,** )<br>**Forrestine Cotten,** )<br>)<br>    **Plaintiff,** )<br>)<br>**v.** )<br>)<br>**Brenda Harvey, Commissioner, Maine** )<br>**Department of Health and Human** )<br>**Services,** )<br>)<br>    **Defendant,** )<br>)<br>)<br>_____) | **Civil Action No. _____** |

## VERIFIED COMPLAINT
## (INJUNCTIVE RELIEF SOUGHT)

1. Adam Cotten, is a twenty-nine year old man with multiple disabilities who is eligible for and obtains his health care services through Maine's Medicaid Program, known as MaineCare.  Due to the Maine Department of Health and Human Service's (the "Department") termination of its MaineCare's Day Habilitation Services for Persons with Mental Retardation Program ("Day Hab") on April 1, 2010, Mr. Cotten will lose vital community-based services.   Without these services, he is at risk of being forced into an institution, either a nursing facility or an Intermediate Care Facility for the Mentally Retarded ("ICF/MR"), in violation of Title II of the ADA, 42 U.S.C. § 12133, and Section 504 of the Rehab Act, 29 U.S.C. § 794.   The Plaintiff, therefore, brings this action against Maine's Commissioner of the Department and Health and Human Services (hereafter the "Defendant").

JURISDICTION AND VENUE

2.  This action is brought pursuant to Title II of the ADA, 42 U.S.C. § 12133, and Section 504 of the Rehab Act, 29 U.S.C. § 794.  The Defendant is a public entity subject to Title II of the ADA and a recipient of federal financial assistance under Section 504 of the Rehab Act.

3.  This Court has jurisdiction over this action for declaratory relief pursuant to 28 U.S.C. § 2201 and Rule 57 of the Federal Rules of Civil Procedure.  Injunctive relief is authorized by 28 U.S.C. § 2202, and Rule 65 of the Federal Rules of Civil Procedure.

4.  Venue is proper in the District of Maine pursuant to 28 U.S.C. § 1391(b)(2), as a substantial part of the events or omissions giving rise to these claims occurred within the State of Maine.

PARTIES

5.  Plaintiff Adam Cotten is a 29-year-old MaineCare recipient who lives with his mother and guardian, Forrestine Cotten, in the City of Bangor, County of Penobscot, in the State of Maine.

6.  Mr. Cotten is diagnosed with Hydrocephalus Quadraplegia, Moderate-to-Severe Mental Retardation, Epilepsy, Chronic Aspiration Pnemonia, Wolff Parkinson White Syndrome, Osteoporosis, Major Depressive Disorder, Bi-polar Disorder, and Anxiety Disorder.  As a result of his multiple physical and cognitive disabilities, he requires constant supervision and cannot be left alone and is a qualified individual with a disability.

7.  Mr. Cotten's medical and habilitation needs are currently being met in the community by a combination of services provided by the Day Hab program; MaineCare's

Home and Community-Based Benefits for the Elderly and for Adults with Disabilities Waiver program ("ADW"), personal care attendant/certified nursing assistant services delivered to him at home; and additional supports provided by his mother.

8.   The Maine Department of Health and Human Services is Maine's single Medicaid agency responsible for the administration and supervision of Maine's Medicaid Program under Title XIX of the Social Security Act.  Defendant Brenda Harvey is the Commissioner of the Department of Health and Human Services for the State of Maine. Her principal place of business is in the City of Augusta, County of Kennebec, in the State of Maine.  She has overall responsibility for administrating Maine's Medicaid Program, MaineCare.  She is responsible for ensuring that the rules, policies and practices of the Maine Department of Health and Human Services are conducted in compliance with the with federal law, including the Americans with Disabilities Act, Section 504 of the Rehabilitation Act, and the Medicaid Act.  She is sued in her official capacity only.

## FACTUAL ALLEGATIONS

### *Anti-Discrimination Laws*

*The Americans with Disabilities Act And Its Integration Mandate*

9.   On July 12, 1990, Congress enacted the ADA, 42 U.S.C. § 12101-12213 (ADA), establishing the most important civil rights laws for persons with disabilities in our nation's history.

10. Congress stated in its findings that "historically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem."  42 U.S.C. § 12101(a)(2).

11. Congress found that "discrimination against individuals with disabilities persists in … institutionalization … and access to public services."  42 U.S.C. § 12101(a)(3).  It also found that "individuals with disabilities continually encounter various forms of discrimination, including outright intentional exclusion . . . , segregation, and relegation to lesser services, programs, activities, benefits, jobs, or other opportunities."  42 U.S.C. § 12101(a)(5).

12. Congress further concluded that "[i]ndividuals with disabilities are a discrete and insular minority who have been faced with restrictions and limitations, subjected to a history of purposeful unequal treatment, and relegated to a position of political powerlessness in our society, based on characteristics that are beyond the control of such individuals and resulting from stereotypic assumptions not truly indicative of the individual ability of such individuals to participate in, and contribute to, society."  42 U.S.C. § 12101(a)(7).

13. A major purpose of the ADA is to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities, and to provide clear, strong, consistent and enforceable standards addressing discrimination against individuals with disabilities.  42 U.S.C. § 12101(b)(1)&(2).

14. Title II of the ADA provides that "no qualified individual with a disability shall, reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by such entity." 42 U.S.C. § 12132.

15. "Discrimination" under the ADA includes the segregation of persons with disabilities from society as a result of unnecessary institutionalization.  As the Senate

Labor and Human Relations Committee observed: "One of the most debilitating forms of discrimination is segregation imposed by others ... Discrimination *also* includes exclusion, or denial of benefits, services, or other opportunities that are as effective and meaningful as those provided to others." S. Rep. No. 116, 101st Cong., 1st Sess. 6 (1989) (emphasis added). Thus, Congress recognized that "discrimination" against persons with disabilities entails more than just disparate treatment, and that simply requiring evenhanded treatment would not remedy all discrimination.

16. The regulations implementing the ADA require that: "a public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R.§ 35.130(d). The affirmative duty embodied in 28 C.F.R.§ 35.130(d) stems from the recognition that the failure to integrate individuals with disabilities in society (for example, through unnecessary institutionalization) constitutes unlawful discrimination under the ADA.

17. The United States Supreme Court in *Olmstead v. L.C. ex rel. Zimring,* 527 U.S. 581 (1999), held that the unnecessary institutionalization of individuals with disabilities is a form of discrimination under Title II of the ADA. In doing so, the high Court interpreted the ADA's "integration mandate" as requiring persons with disabilities to be served in the community when: (1) the state determines that community-based treatment is appropriate; (2) the individual does not oppose community placement; and, (3) community placement can be reasonably accommodated. 527 U.S. at 607.

18. As has been shown by his current community placement, a community-based placement is desirable and appropriate for Mr. Cotten and he has benefited from access to community-based services. Furthermore, his ongoing placement in the community can be

reasonably accommodated.

19. Defendant has not taken reasonable actions to determine and ensure that the MaineCare program and other disability support services are administered in the most integrated setting appropriate for Plaintiff.

20. Defendant's actions, taken under the color of state law, will deprive the Plaintiff of his federally protected rights.

21. The Plaintiff has no adequate remedy at law.

*Section 504 of The Rehabilitation Act*

22. Section 504 of the Rehabilitation Act of 1973 provides, "No otherwise qualified individual with a disability in the United States …, shall, solely by reason of her or his disability, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794.

23. Regulations implementing Section 504 require a recipient of federal financial assistance to administer its services, programs, and activities in "the most integrated setting appropriate" to the needs of qualified individuals with disabilities. 28 C.F.R. § 41.51(d).

24. Regulations implementing Section 504 prohibit recipients of federal financial assistance from "[u]tiliz[ing] criteria or methods of administration … (i) [t]hat have the effect of subjecting qualified handicapped persons to discrimination on the basis of handicap [or] (ii) [t]hat have the … effect of substantially impairing accomplishment of the recipients' program with respect to handicapped persons." 45 C.F.R. § 84.4(b)(4); 28 C.F.R. § 41.51(b)(3)(i).

*Medicaid and MaineCare Programs*

*The State-Federal Medicaid Program*

25. Medicaid is a jointly funded state and federal program that provides medical services to low-income persons pursuant to Title XIX of the Social Security Act.  42 U.S.C. § 1396-1396v.  The purpose of Medicaid is to furnish, as far as practicable, "medical assistance on behalf of...aged, blind or disabled individuals, whose income and resources are insufficient to meet the costs of necessary medical services" and "to help such families and individuals to *attain or retain capability for independence or self-care....*"  42 U.S.C. § 1396-1 (emphasis added).

26. State participation in the Medicaid program is optional.  States choosing to receive federal matching funds for their Medicaid program must comply with the requirements of the federal Medicaid Act and with the federal regulations governing state Medicaid programs promulgated by the U.S. Department of Health and Human Services (hereafter "HHS").  42 U.S.C. § 1396, 42 C.F.R. §§ 430-484.  The Centers for Medicare and Medicaid Services (CMS) is responsible for the administration of the Medicaid program.

27. The state Medicaid agency may place appropriate limits on services based on such criteria as medical necessity or on utilization control procedures.

28. Maine has chosen to participate in the Medicaid program.  It has prepared a state plan, which CMS has reviewed and approved.  That plan, along with relevant federal law and regulations, forms the foundation for the Maine's Medicaid program and establishes the State's obligations and responsibilities to Medicaid recipients.  DHHS and its Commissioner, Brenda Harvey, administer the Medicaid program.

29. The Medicaid Act authorizes states to obtain Home and Community Based Services waivers ("HCBS waivers") from the Centers for Medicare and Medicaid Services (CMS). See 42 U.S.C. § 1396n(c) (also known as Section 1915(c) of the Social Security Act). These programs allow the State to provide home-based habilitative services to, among others, persons who would otherwise require care in an Intermediate Care Facility for Persons with Mental Retardation ("ICF/MR") or a nursing facility. *Id.* These programs cover a range of home-based services for limited numbers of Medicaid recipients. *See* 42 U.S.C. § 1396n(c). Maine covers these services. The Department has failed to coordinate the activities, programs, and resources of the agencies under its control in order to ensure that the Plaintiff receives medically necessary services, in the least restrictive setting.

*Background of MaineCare's ADW Program*

30. The ADW is a HCBS, community-based waiver program for persons whose disabilities put them at risk of living in nursing facility. In addition to meeting general MaineCare eligibility criteria, to be eligible for ADW a person must also must meet the MaineCare medical eligibility requirements for a nursing facility. Me. Dep't of Hum. Serv., 10-144 CMR 101-19.02-2.

31. The ADW provides "in-home care and other services designed as a package to assist eligible members to remain in their homes, or other residential community settings, and thereby avoid or delay institutional nursing facility care." Me. Dep't of Hum. Serv., 10 144 CMR 101-19.

*Background on Maine's Day Hab and Other Community Based Programs*

32. Day Hab, also known as Section 24, is a community-based day program for

persons with Mental Retardation or Pervasive Developmental Delay Disorders.  In
addition to meeting general MaineCare eligibility criteria, a person must also meet
medical eligibility requirements for an ICF/MR.  Me. Dep't of Hum. Serv., 10 144 CMR
101.   Historically, persons eligible for Day Hab include medically eligible children and
adults who live in the community, reside in ICFs/MR, or reside in nursing facilities.

33.     "Day habilitation services are those services or training for persons with
mental retardation that focus primarily upon behavior management and physical
development to promote self maintenance, physical fitness, self awareness, self
motivation, and to address sensory, motor and psychological needs."  Me. Dep't of Hum.
Serv., 10 144 CMR 101-24.01-2.   The Department has set an annual ceiling of $26,500
for the amount it will reimburse providers for delivering this service to an individual.
Me. Dep't of Hum. Serv., 10 144 CMR 101-24.6010.

34. Based on information and belief, the Department has been planning to end this
program for at least two years.  The Department has made an effort to find replacement
services for *most* individuals who currently receive or have received Day Hab in the past.

35. Based on information and belief, most children who were or are eligible for
Day Hab will continue to receive services community support services after the
termination of Day Hab.  Children will receive these services through a new program
called "Rehabilitation and Community Support Services for Children with Cognitive
Impairments and Functional Limitations." The concise rulemaking summary for this new
regulatory section states: "The Department is proposing a new MaineCare section,
Section 28, which will provide current Section 24 services, as well as additional services,
to an expanded children's eligibility group. The Department is repealing Section 24

because it is deleting this service for adults. The Department anticipates that most adults

who now receive Section 24 services will be provided this service under some

institutional providers."  10/28/09 WEEKLY NOTICES OF STATE RULE-MAKING,

*PROPOSED RULE NUMBER: 2009-P278 available at*

http://www.maine.gov/sos/cec/rules/notices/2009/102809.htm.

36. Based on information and belief, persons living in nursing facilities who are

receiving Day Hab services will continue receiving these services after the termination of

Day Hab.  Recently, the Department proposed new regulations to continue providing Day

Hab to nursing facility residents.  The concise summary for these new rules state that the

new rule:  "adds a service for [nursing facility] residents who have been receiving

services under Section 24, Day Habilitation Services, which are being repealed."

1/13/2010 notice of proposed rule change, available at

http://www.maine.gov/dhhs/oms/rules/proposed.shtml#id91101.

37. Based on information and belief, persons living in ICFs/MR who are receiving

Day Hab services will continue to receive community support services after the

termination of Day Hab on April 1, 2010.  The Governor's December 18, 2009

supplemental budget proposed eliminating reimbursement for Day Hab for residents of

ICFs/MR.  *Available* at http://www.maine.gov/budget/budgetinfo/2010supplemental.htm,

Part A, at p. A-64.  These proposed cuts, however, were restored in the Governor's

Second Change Package, March 3, 2010.  Available at

http://www.maine.gov/budget/budgetinfo/2010supplemental.htm, Governor's Second

Change Package, March 3, 2010, at p. 14.

38. Based on information and belief, most adults who reside in the community

and were eligible and receiving Day Hab services in the past, will continue receiving community support services through the Section 29 Waiver.  The Section 29 Waiver, however, excludes persons, like Mr. Cotten, who receive services through the ADW program. Me. Dep't of Hum. Serv., 10 144 CMR 101-29.07; 101-29.01 ("Eligible MaineCare members may only receive services under one waiver benefit at a time.").

*Adam Cotten's Program*

39. As a result of his disabilities, Mr. Cotten has physical limitations and a limited ability to take care of himself.  He needs assistance with all of his activities of daily living, including bathing, dressing, meal preparation, personal hygiene, laundry, and mobility, among other activities.  He cannot walk, transfer out of his wheelchair, use the phone, dispense his medication, turn over when lying down, or exit the home independently in case of an emergency.  He is incontinent and has a spastic bladder; as a result, he must wear diapers.

40. Mr. Cotten has limited use of his right arm and can feed himself with supervision.  He is able to pick up and eat food and drink liquids if placed within his reach.  Because Mr. Cotten has Chronic Aspiration Pneumonia his caregivers must vigilantly monitor him for aspiration, especially while eating or drinking.

41. Mr. Cotten's bones are extremely fragile because of his osteoporosis.  Due to bone infections and breaks, he has had part of his femur removed and his girdlestone removed from his hip.  He uses a seatbelt to keep him safe in his wheel chair and lounge chair and at Day Hab he has a raised mat with a side rail to prevent him from rolling off the mat.  Any fall would put him at extreme risk of breaking bones; accordingly, his care providers must constantly monitor him to prevent falls.

42. In addition to his physical limitations, Mr. Cotten's cognitive limitations and mental illnesses limit his ability to care for himself and interact with others. Mr. Cotten has a fear of new places and people. He has difficulty with articulation and oral motor control, which often makes it difficult to for others understand him. He willingly makes attempts to communicate with others, but becomes frustrated when these efforts are unsuccessful. When Mr. Cotten becomes frustrated, for whatever reason, he hits his mother or care providers. He also yells and screams for a sustained period of time. He has a behavior management plan that is consistently carried out by his mother and his Day Hab providers. In the past, even a short break from his Day Hab program has caused significant behavior regression.

43. Through the Day Hab program, Mr. Cotten receives 25 hours per week of community support services at the Bouchea Center. At the Bouchea Center, he interacts with his peers, works on skills to improve his community and social relationships, acquires skills that improve his ability to interact with others, participates in community outings with his peers, works on skills that will develop his cognitive abilities, and receives physical therapy services to increase his range of motion and increase strength in his right arm. This program is vital to his safety, health, and well-being.

44. Mr. Cotten also qualifies for and receives 58 hours per week of personal supports at home to support him with his activities of daily living through the ADW program.

45. Mr. Cotten's mother and guardian also provides additional personal supports to him at home, to the extent that she can. Ms. Cotten works at least 40 hours each week and also helps care for her elderly mother. Ms. Cotten will not be able to stay home and

take care of Mr. Cotten if his hours are cut.  There is no one else to care for him.

46. Aware that the Department was planning to end Day Hab services, for several months Ms. Cotten repeatedly spoke with and wrote to Department officials seeking alternate services that would continue to allow Mr. Cotten to remain at home in the community once the Day Hab program was eliminated.

47. On or about March 1, 2010, the Cottens received notice from the Department informing them that "MaineCare will no longer pay for Day Habilitation Services effective April 1, 2010."  Although noting that some members may be able to receive similar services under different MaineCare programs, the notice states:

> Members who are on the Adults with Disabilities Waiver will no longer be able to receive Day Habilitation.  Federal rules do not allow a person to be in two waivers at once.

48. The notice also states: "You do not have a right to appeal services that are no longer covered by MaineCare."

49. Mr. Cotten, through his attorney, has engaged in an interactive process to have the Defendant continue to provide him with MaineCare services that would allow him to remain in a community-based, integrated setting.  At this time, the Defendant informally has agreed to provide Mr. Cotten with one day per week of community support services for the remainder of this fiscal year and the next fiscal year.  As a result, on April 1, 2010, Mr. Cotten will lose 4 days (or twenty hours) per week of Day Hab services.

50. Mr. Cotten and his mother/guardian wish for him to remain in his family home with his current level of Day Hab services, and he is at imminent risk of institutionalization in a nursing facility or an ICF/MR if these services are cut.

FIRST CLAIM FOR RELIEF
(Title II of the Americans with Disabilities Act)

51. Plaintiff adopts and restates the allegations set forth in paragraphs 1-50 of this complaint.

52. Plaintiff is an individual with disabilities in that he has physical and other impairments that substantially limit one or more of his major life activities, including but not limited to, breathing, walking, speaking, and standing.

53. Plaintiff is a qualified person with disabilities in that he is capable of safely living at home with necessary services and he meets the essential eligibility requirements for the receipt of services from and participation in the State Medicaid program with reasonable modification to the rules, policies, and practices of that program, 42 U.S.C. §12131(2).

54. Without reasonable modification of the rules, policies, and procedures governing the MaineCare program, Plaintiff will be forced to enter an isolated and segregated in a harmful institutional setting against his will.

55. Defendant's elimination of MaineCare funding for the Plaintiff's Day Hab services, which Plaintiff requires to avoid segregation in an institution and remain in the integrated home settings that is appropriate to meet his needs, constitutes unlawful discrimination in violation of Title II of the Americans with Disabilities Act, 42 U.S.C. § 12132, and its implementing regulation, 28 C.F.R. § 130.51(d).

56. Defendant has utilized criteria and methods of administration that subjects Plaintiff to discrimination on the basis of disability, including the imminent risk of unnecessary institutionalization, by failing to ensure that Plaintiff has access to MaineCare covered services that will meet his needs in the community in violation of

Title II of the ADA and implementing regulations.

SECOND CLAIM FOR RELIEF
(Section 504 of the Rehabilitation Act)

57. Plaintiff adopts and restates the allegations set forth in paragraphs 1-56 of this complaint.

58. Plaintiff is a "qualified person with disabilities" within the meaning of Section 504, because he has physical and/or mental impairments that substantially limit one or more major life activities, and he meets the essential eligibility requirements for long term care under MaineCare.

59. Defendant's elimination of MaineCare funding for the Plaintiff's Day Hab services, which Plaintiff requires to avoid segregation in an institution and remain in the integrated home setting that is appropriate to meet his needs constitutes unlawful discrimination in violation of Section 504 of the Rehabilitation Act, 29 U.S.C. §794(a), and its implementing regulation, 28 C.F.R. §41.51(d).

60. Defendant has utilized criteria and methods of administration that subjects Plaintiff to discrimination on the basis of disability, including the imminent risk of unnecessary institutionalization, by failing to ensure that Plaintiff has access to MaineCare covered services that will meet his needs in the community in violation of Section 504 and its implementing regulations.

RELIEF REQUESTED

61. WHEREFORE, plaintiff respectfully requests that the Court grant the following relief:

      A.      Declare the Defendant's termination Plaintiff's necessary and appropriate community-based services constitutes unlawful discrimination in

15

violation of Title II of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act.

B.      Grant a temporary restraining order and a preliminary injunction requiring the Defendant, her officers, agents, employees, attorneys, and all persons who are in active concert or participation with her to continue providing Mr. Cotton with Day Hab or similar, community-based services.

C.      Grant preliminary and permanent injunctions requiring the Defendant, her officers, agents, employees, attorneys, and all persons who are in active concert or participation with her to provide for individualized coverage of Plaintiff's service needs in the least restrictive, most integrated setting.

D.      Waive the requirement for the posting of a bond as security for the entry of preliminary relief.

E.      Award the Plaintiff the costs of this action and reasonable attorney's fees pursuant to 29 U.S.C. § 794a and 42 U.S.C. § 12133 and any other applicable provision of law.

F.      All such other and further relief as the Court deems to be just and equitable.

Dated:  March 30, 2010

Respectfully submitted,
/s/ Staci Converse
/s/ Peter Rice

Disability Rights Center
24 Stone Street
P.O. Box 2007
Augusta, ME 04338-2007
(207) 626-2774
sconverse@drcme.org
price@drcme.org

**VERIFICATION**

I SWEAR (OR AFFIRM) UNDER THE PENALTIES FOR PERJURY UNDER THE LAWS OF THE UNITED STATES THAT THE FACTUAL STATEMENTS IN THIS COMPLAINT ARE TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE.

Dated at Bangor, Maine this 30th day of March, 2010.

/s/ Forrestine Cotten
Forrestine Cotten


State of Maine                                        Date:  March 30, 2010
County of Penobscot, ss.

    Personally appeared the above-named Forrestine Cotten and made oath as to the truth of the foregoing statements.

    Before me,

/s/ Patricia MacAlister
Notary Public/Attorney at Law